## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CRIMINAL ACTION** |
| v. | ) | |
| | ) | **No. 08-20106-KHV** |
| CARLOS GUADALUPE BELTRAN-AGUILAR | ) | |
| and JOSE TORRES-GARCIA, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

On September 10, 2008, a grand jury indicted Carlos Guadalupe Beltran-Aguilar and Jose

Torres-Garcia with conspiracy to distribute 50 grams or more of methamphetamine in violation of

21 U.S.C. § 846, possession of 50 grams or more of methamphetamine with intent to distribute in

violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and making a residence available for storing,

using and distributing methamphetamine in violation of 21 U.S.C. § 856(a)(2).  This matter is before

the Court on the Motion To Suppress Evidence And Memorandum In Support (Doc. #23) and the

Motion To Suppress Evidence (Doc. #24) filed December 12, 2008.  On December 22, 2008, the

Court held an evidentiary hearing.  For reasons stated below, the Court overrules both motions.

### Facts

Based on testimony and exhibits received at the hearing, the Court finds the following facts:

On August 20, 2008, as part of a Drug Enforcement Administration ("DEA") investigation

in Kansas City, Kansas, an undercover police officer ("UC") spoke with Jose Viera (a.k.a. "Brian")

about a purchase of methamphetamine.  The UC had previously purchased methamphetamine from

Viera, and the UC advised Viera that he wanted to purchase three to four ounces of

methamphetamine.  Viera agreed to sell the methamphetamine to the UC for $800 per ounce.

On August 25, 2008, the UC telephoned Viera and they arranged to meet that afternoon outside a movie theatre in Merriam, Kansas.  At 4:00 p.m., DEA established surveillance at Viera's residence at 1125 Metropolitan in Kansas City, Kansas.  At 5:44 p.m., a black 2002 Honda Accord, Missouri license plate 4CT-07F, registered to Valentin Lizardi-Deltoro, arrived at the residence. A Hispanic male got out of the Honda and entered the house.  At 6:28 p.m., the same Hispanic male returned to the Honda.  Officers followed the Honda to 4800 State avenue and then broke off surveillance to provide backup for the controlled purchase at the movie theatre in Merriam.  At 6:40 p.m., Viera telephoned the UC and said that he would be at the meeting location in five minutes.

Shortly thereafter, Viera arrived at the movie theatre in Merriam in a white Ford Explorer with a Hispanic male who identified himself as "Alfred."  Alfred got into the UC's vehicle while Viera drove around in a circle and then parked next to the UC's vehicle.  Alfred removed from his pants a clear bag which contained four ounces of methamphetamine and handed it to the UC, stating that the price was $3,600.  Because Viera had previously told the UC that the price would be $800 per ounce, the UC asked Viera, who confirmed that the price was $3,600 for four ounces.  The UC then paid Alfred, who left with Viera in the Explorer.

DEA agents followed the Explorer back to Viera's residence where Alfred and Viera went into the residence.  Officers observed that the Honda was again parked in front of Viera's residence. Officers then observed a Hispanic male leave the residence and depart in the Honda.  DEA agents followed the Honda to 1118 North 50th Street in Kansas City, Kansas and continued to monitor that residence.

On August 27, 2008, at approximately 1:00 p.m., officers saw the Honda parked in front of the residence at 1118 North 50th Street.  A 1999 black Jeep Cherokee, Nebraska license plate RAP-534, arrived at the residence.  Beltran and Torres got out of the Jeep and approached the front door. Beltran unlocked the front door and entered the residence with Torres.

At approximately 1:30 p.m., Beltran left the residence in the Jeep and drove to a Dollar General store at 50th and State Avenue.  Special Agent Tim Ditter entered the store in plain clothes and saw Beltran buy a large box of Gain laundry detergent.  Beltran left the store and returned to the residence at 1118 North 50th Street.  At approximately 1:55 p.m., the Jeep and the Honda traveled in tandem to a gas station at 47th and State Avenue.  Special Agent Ditter saw Beltran and Torres in the Honda and two other Hispanic males in the Jeep.  Ditter and other officers followed the Jeep and the Honda as they traveled in tandem on I-29 northbound from Kansas City.

Sheriff deputies stopped the Jeep.  A narcotics canine positively indicated on the vehicle, but officers did not find any narcotics in the vehicle.  The Honda continued traveling northbound and officers continued to follow it.  At approximately 3:15 p.m., Missouri Highway Patrol Trooper William Lashmet saw the Honda speeding in a work zone near Mound City, Missouri and initiated a traffic stop.  Shortly before the stop, Trooper Lashmet learned that DEA was following the Honda and was requesting assistance to stop the vehicle which was believed to be carrying a large quantity of methamphetamine.  Trooper Lashmet recorded the traffic stop on his in-car camera which included two views – one inside the front of the patrol car and the other outside the front of the patrol car.

Trooper Lashmet immediately advised Beltran why he had stopped him and asked for his driver's license, registration and proof of insurance.  Beltran handed Trooper Lashmet a Missouri

drivers license and a registration for the vehicle. Torres gave Trooper Lashmet a Mexico driver's license bearing the name Juan Ahon Colorado. While obtaining the documents Trooper Lashmet noticed several air fresheners throughout the vehicle and two Boost Mobile pre-paid cellular telephones. Approximately two minutes into the stop of the Honda, Beltran told Trooper Lashmet that the car did not belong to him. Neither Beltran nor Torres were the registered owners of the vehicle, and they told Trooper Lashmet that they did not know who owned it.

Another trooper approached the Honda to provide assistance to Trooper Lashmet. Trooper Lashmet asked Beltran to have a seat in his patrol car while Trooper Lashmet ran the driver's license information through dispatch. Torres remained seated in the Honda while the second trooper asked him questions.

Trooper Lashmet utilized a Spanish phrase guide to converse with Beltran inside the patrol car. Beltran advised that they were traveling to Omaha. When Trooper Lashmet asked who was traveling with Beltran, Beltran looked at Torres' license before he replied "Juan." Approximately nine minutes into the stop of the vehicle, Trooper Lashmet asked Beltran in Spanish for permission to search the vehicle. Beltran immediately and unequivocally said yes in Spanish. Shortly thereafter, a third trooper arrived.

Trooper Lashmet asked Beltran and Torres to wait in the grass away from the roadway while officers searched the vehicle. Trooper Gilliland performed a pat-down of Torres and found over $2,000.00 in U.S. currency in his pants pocket. Both Beltran and Torres had $2.00 bills in their possession which officers recognized as an item carried by drug traffickers for good luck when transporting narcotics. Approximately 13 minutes into the stop, Trooper Lashmet noted a large box of Gain laundry detergent in the trunk and told the other trooper that the box was what they were

"supposed to be looking for." Trooper Lashmet called a DEA agent and advised that they had found a Gain detergent box in the trunk of the Honda. Trooper Lashmet then advised the other trooper that they were looking for methamphetamine. Trooper Lashmet opened the Gain laundry detergent box and found some 904 net grams of methamphetamine. The methamphetamine was packaged in two, one-pound bundles which were wrapped in aluminum foil and green tinted cellophane. Officers arrested Beltran and Torres and read their Miranda warnings. Beltran was issued a citation for exceeding the speed limit in a work zone. Officers then transported defendants to jail.

At 4:35 p.m., Special Agent Ditter, who is fluent in Spanish, spoke to Beltran. Beltran advised that for approximately one month, he had resided with Brian at 1118 North 50th Street in Kansas City, Kansas. Beltran declined to answer further questions without an attorney. Special Agent Ditter then interviewed Torres, who initially provided the false name of Juan Ahon Colorado. Special Agent Ditter read Torres his Miranda warnings in Spanish and Torres agreed to speak with officers. Torres said that he had entered the United States from Mexico with Jaime Bastillas. Torres said that he resided with Beltran at 1118 North 50th Street in Kansas City, Kansas. Torres said that the owner of the Honda was Valentin Lizardi and that Lizardi left him $2,000 to rent the house at 1118 North 50th Street. Torres advised that he and Beltran were en route to Omaha, Nebraska to visit Juana Quevada-Garcia but Torres could not provide her address, telephone number or time or place where they planned to meet her. Torres stated that he did not know anyone named Brian. Torres said that Lizardi had loaned the Honda to him and Beltran, and that the box of Gain laundry detergent was already in the car when they borrowed it. Torres said he was unemployed and that Guadalupe Villareal had loaned him the cash found in his wallet.

Special Agent Ditter asked Beltran and Torres for consent to search the residence at 1118

North 50th Street.  Special Agent Ditter translated the DEA consent to search form into Spanish for

Beltran and Torres.  They both provided written consent to search the residence.  Beltran then gave

officers the key to the residence.  When officers searched the residence, they found an open package

of Krazy glue and an exacto knife with detergent crumbs on the kitchen counter; a brown plastic

grocery bag containing loose laundry detergent on the kitchen table; and a digital scale, green tinted

cellophane and 383 grams of dimethyl sulfone, a commonly used cutting agent for

methamphetamine, in the kitchen cabinet.  Officers also found a drug ledger, Western Union wire

transfer receipts, a Boost cellular telephone manual and two bundles of cellophane with U.S.

currency totaling $18,000 concealed in a closet.

### Analysis

**I.     Traffic Stop**

The Fourth Amendment of the United States Constitution protects persons and their houses,

papers and effects against unreasonable searches and seizures.  See U.S. Const. amend. IV.  The

Tenth Circuit has defined three categories of police/citizen encounters: (1) voluntary cooperation

in response to non-coercive questioning; (2) investigatory; and (3) arrest.  United States v. Muldrow,

19 F.3d 1332, 1335 (10th Cir.) (citing United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir.), cert.

denied, 467 U.S. 1255 (1984)), cert. denied, 513 U.S. 862 (1994); see Terry v. Ohio, 392 U.S. 1

(1968).  This case involves the second category: an investigatory or Terry stop.  See United States

v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005) (traffic stops are seizures analogous to

investigative detentions).

A traffic stop constitutes a seizure for purposes of the Fourth Amendment "even though the

purpose of the stop is limited and the resulting detention quite brief."  Brendlin v. California, 551 U.S

249, 127 S. Ct. 2400, 2406 (2007) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  In

deciding whether an investigatory detention is permissible, the Court must determine both "whether

the officer's action was justified at its inception, and whether it was reasonably related in scope to

the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20.  Law

enforcement officers may stop and briefly detain a person for investigative reasons if the officer has

a reasonable suspicion that criminal activity may be afoot.  United States v. Sokolow, 490 U.S. 1,

7 (1989).  Reasonable suspicion requires a "particularized and objective basis for suspecting the

particular person stopped of criminal activity."  United States v. Cortez, 449 U.S. 411, 417-18

(1981).  After an officer resolves the concern that justified the initial stop, any further detention must

be supported by a reasonable suspicion of criminal activity.  See United States v. Alarcon-Gonzalez,

73 F.3d 289, 292-93 (10th Cir. 1996).  Thus, "reasonable suspicion must exist at all stages of the

detention, although it need not be based on the same facts throughout."  United States v.

Soto-Cervantes, 138 F.3d 1319, 1322 (10th Cir.), cert. denied, 525 U.S. 853 (1998).  "Specific and

articulable facts" are necessary to support a finding of reasonable suspicion; an inchoate and

unparticularized suspicion or hunch is inadequate.  Terry, 392 U.S. at 21.  In determining whether

reasonable suspicion existed, the Court considers the totality of the circumstances, Sokolow, 490

U.S. at 8, including the collective knowledge of those officers involved in the investigation, United

States v. Hinojos, 107 F.3d 765, 768 (10th Cir. 1997).  The Court evaluates the officers' conduct "in

light of common sense and ordinary human experience," deferring to "the ability of a trained law

enforcement officer to distinguish between innocent and suspicious actions."  United States v.

Stephenson, 452 F.3d 1173, 1176 (10th Cir. 2006) (internal quotation marks and citations omitted).

The government bears the burden of proving the reasonableness of the officers' suspicion.  United

States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998); see also United States v. Lutz, 207 F. Supp.2d 1247, 1255 (D. Kan. 2002) (government must show traffic stop justified by reasonable articulable suspicion of illegal activity).

Defendants argue that officers did not have reasonable suspicion or probable cause to stop their vehicle and investigate them.  Defendants argue that the methamphetamine, currency and other items which officers obtained from the residence later that evening were fruits of their unlawful detention and should be suppressed.  Trooper Lashmet testified that he stopped the Honda because (1) he saw the vehicle speeding in a work zone and (2) the DEA had asked for assistance in stopping the vehicle.

A.     Observed Traffic Violation

The decision to stop an automobile is reasonable where law enforcement officers have probable cause to believe that a traffic violation has occurred.  Whren v. United States, 517 U.S. 806, 810 (1996); Delaware v. Prouse, 440 U.S. 648, 659 (1979); see United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (traffic stop is valid if it is based on observed traffic violation), cert. denied, 518 U.S. 1007 (1996).  Here, Trooper Lashmet saw the Honda speeding in a work zone. Therefore he had probable cause to believe that a traffic violation had occurred.[1]

---

[1]      Defendants apparently maintain that Trooper Lashmet actually stopped the vehicle because of the information from the DEA.  After an officer observes a traffic violation, however, his subjective motivations for following the vehicle or conducting a stop are not relevant to the Fourth Amendment inquiry.  See United States v. Rubalcava-Roacho, No. 07-3362, 2008 WL 4874186, at *3 (10th Cir. Nov. 12, 2008) (after officer observes traffic violation, subjective motivations for following vehicle or conducting stop have no bearing on Fourth Amendment reasonableness inquiry); United States v. Cervine, 347 F.3d 865, 870 (10th Cir. 2003) (traffic violation provided troopers reasonable suspicion to stop car; other motivations not relevant to inquiry); see also Whren, 517 U.S. at 813 (subjective intentions play no role in ordinary probable cause analysis).

B.     Information From DEA Agents

In addition to the observed traffic violation, Trooper Lashmet had reasonable suspicion that defendants were involved in drug trafficking based on the collective information of law enforcement officers.  Based on the following facts which DEA agents knew, officers had reasonable suspicion that defendants were involved in criminal activity:

1.     On August 25, 2008, DEA agents saw the Honda at the residence of a known drug dealer (Viera) for some 45 minutes.  A Hispanic male left in the Honda shortly before Viera left the residence to meet an undercover agent for a sale of methamphetamine.

2.     On August 25, 2008, when Viera returned from the sale of methamphetamine, DEA agents again saw the Honda at Viera's residence.

3.     On August 27, 2008, the day of the traffic stop, DEA agents saw Beltran drive the Honda a short distance to a store, purchase one large box of laundry detergent and return to his residence.  Shortly thereafter, officers saw Beltran and Torres leave the residence and travel in the Honda to a nearby gas station and proceed northbound on I-29.  A Jeep, which was parked at defendant's residence and had Nebraska license plates, traveled in tandem with the Honda to the gas station and northbound on I-29.

Even though the activities of defendants and the Honda's relationship to drug activity may have been ambiguous and susceptible of innocent explanation, officers may detain individuals to resolve the ambiguity.  Illinois v. Wardlow. 528 U.S. 119, 126 (2000) (Terry accepts risk that officers may stop innocent people); see United States v. Arvizu, 534 U.S. 266, 277 (2002) (reasonable suspicion need not rule out possibility of innocent conduct); see also United States v. Quintero-Quivoz, 145 Fed. Appx. 216, 218 (9th Cir. 2005) (reasonable suspicion based on link to residence of suspected drug activity plus driving in tandem); United States v. Montero-Camargo, 208 F.3d 1122, 1139 (9th Cir.) (en banc) (driving in tandem given some weight in reasonable suspicion analysis), cert. denied, 531 U.S. 889 (2000); United States v. Melendez-Garcia, 28 F.3d 1046, 1049-51 (10th Cir. 1994) (driving

in tandem established reasonable suspicion of criminal activity); United States v. Reid, 997 F.2d 1576, 1579 (D.C. Cir. 1993) (greater likelihood that person in small private residence containing drugs will be involved in drug activity occurring there than individual who happens to be in tavern where bartender suspected of possessing drugs), cert. denied, 510 U.S. 1132 (1994); United States v. Harvey, 897 F.2d 1300, 1304 (5th Cir. 1990) (driving up next to drug house during search established reasonable suspicion), overruled in part on other grounds by United States v. Lambert, 984 F.2d 658 (5th Cir. 1993).

Based on the totality of the circumstances, officers had an objectively reasonable and articulable suspicion that defendants were involved in criminal activity and they were justified in stopping defendants' vehicle to question them.

**II.    Continued Detention**

After officers stopped defendants' vehicle, they could detain defendants only so long as they had reasonable suspicion of criminal activity.   See Alarcon-Gonzalez, 73 F.3d at 292-93. Defendants argue that after Beltran produced a valid license and proof that he was entitled to operate the vehicle, Trooper Lashmet should have allowed them to proceed without further delay for additional questioning.  Here, however, defendants did not show that they were authorized to operate the vehicle.  In addition, Trooper Lashmet had not received information from dispatch on the license and registration checks.  Therefore Trooper Lashmet could continue to ask questions pending the license and registration checks.  See United States v. Alcaraz-Arellano, 441 F.3d 1252, 1259 (10th Cir. 2006) (limited questioning permissible while waiting for license check from dispatch).

In the alternative, to the extent that Trooper Lashmet's questions about travel plans and consent to search the vehicle went beyond the scope of the initial traffic stop, they were permissible on two independent grounds: (1) the questions did not unreasonably extend the length of the traffic

stop, see Alcaraz-Arellano, 441 F.3d at 1259 (questioning which does not appreciably lengthen detention requires no Fourth Amendment justification); United States v. Martin, 422 F.3d 597, 601-02 (7th Cir. 2005) (traffic stop not unreasonable merely because officer asks questions unrelated to initial purpose for stop, provided questions do not unreasonably extend length of stop); and (2) officers had reasonable suspicion that defendants were involved in drug trafficking based on the facts outlined above and the observed presence of air fresheners and prepaid cell phones in the vehicle, see United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993) (officer may detain driver for further questioning unrelated to initial stop if officer has objectively reasonable articulable suspicion that illegal activity has occurred or is occurring).

**III.    Search Of Defendants' Vehicle**

Beltran argues that he did not voluntarily consent to the search of the vehicle, that the scope of the search exceeded the scope of any consent and that officers lacked probable cause to search the vehicle.

A.    Consent To Search

The government bears the burden to show that defendant's consent was voluntary.  See United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996).  To establish that defendant's consent was voluntary, the government must (1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given and (2) prove that consent was given without implied or express duress or coercion.  Id. at 719 (quoting United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996)).  Consent to search may be voluntary even though the consenting party is being detained when consent is given.  United States v. Doyle, 129 F.3d 1372, 1377 (10th Cir. 1997).  Whether consent is voluntary is a question of fact to be determined from the totality of the circumstances.  See Soto, 988 F.2d at 1557.  Relevant factors include "the threatening presence of

several officers; the brandishing of a weapon by an officer; some physical touching by an officer;
use of aggressive language or tone of voice indicating that compliance with an officer's request is
compulsory; prolonged retention of a person's personal effects such as identification and plane or
bus tickets; a request to accompany the officer to the station;  interaction in a nonpublic place or a
small, enclosed place; and absence of other members of the public." United States v. Hill, 199 F.3d
1143, 1148 (10th Cir. 1999) (in context of consensual encounter); see Soto, 988 F.2d at 1557-58
(evaluating similar factors in context of investigative detention).  No one factor is dispositive.  See
id. at 1557.

　　　　Here, Trooper Lashmet did not threaten or coerce Beltran and he did not offer Beltran
anything in exchange for his consent to search.  Trooper Lashmet did not use an insisting tone of
voice or manner and he did not physically touch, harass or handcuff Beltran.  In the video of the
traffic stop, Beltran appears to give his consent freely and without hesitation or limitation.  The
location of the encounter in the patrol car weighs slightly in defendant's favor.  At that point,
however, Trooper Lashmet was running routine license and registration checks which are often
accomplished with the driver in the front seat of the patrol car.  The government satisfied its burden
to show that Beltran freely and voluntarily gave his consent to search the vehicle.[2]

　　　　Beltran argues that the search of the unopened box of laundry detergent exceeded the scope
of any consent.  The scope of a search is generally defined by its expressed object.  Florida v.
Jimeno, 500 U.S. 248, 251 (1991).  The standard for measuring the scope of a consent is,

_____

[2]　　　　Defendants argue that a direct translation of Trooper Lashmet's request was to
"check" the vehicle, but Special Agent Ditter testified that the common understanding of this
language is to "search."  Indeed, Special Agent Ditter testified that he has asked for consent to
search in Spanish more than 100 times and no one appeared to misunderstand that his request was
to "search."  In the context of this case, Beltran also appeared to understand that Trooper Lashmet
was asking to search the vehicle.

objectively, what a typical, reasonable person would have understood by the exchange between the officer and the suspect as to the intended scope of the search.  Id.; United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995).

Here, Trooper Lashmet did not tell Beltran the purpose or object of his intended search.  In cases where the officer seeks general permission to search without stating the object of the search, it is self-evident that he is looking for evidence of illegal activity and "just as obvious that such evidence might be hidden in closed containers."  United States v. Snow, 44 F.3d 133, 135 (2d Cir. 1995) (where consent open-ended, reasonable person has no cause to believe that search will be limited); see United States v. Mendoza-Gonzalez, 318 F.3d 663, 669-70 (5th Cir.) (fact that officers did not particularize objective did not limit scope of search which would be deemed reasonable), cert. denied, 538 U.S. 1049 (2003); United States v. Zapata, 18 F.3d 971, 977-78 (1st Cir. 1994) (general consent to search vehicle without knowledge of search's object extends to zipped duffel bag found in trunk).  Moreover, neither defendant objected when Trooper Lashmet opened the detergent box.  See Jimeno, 500 U.S. at 252 (suspect may delimit scope of search to which he consents, but if consent is reasonably understood to extend to particular container, Fourth Amendment provides no grounds for requiring more explicit authorization); United States v. Espinosa, 782 F.2d 888, 892 (10th Cir. 1986) (where defendant generally consents to search of car and then stands by while officer searches trunk, under seats, under carpet, in luggage, in glove box and under left rear panel, search of left rear panel within scope of consent).[3]  In sum, the search of the detergent box did not

---

[3]     "[B]efore an officer may actually destroy or render completely useless a container which would otherwise be within the scope of a permissive search, the officer must obtain explicit authorization, or have some other, lawful, basis upon which to proceed."  United States v. Osage, 235 F.3d 518, 522 (10th Cir. 2000).  Here, such explicit authorization was not required because Trooper Lashmet did not destroy the container or its contents when he cut open the top of the laundry detergent box and sifted through the detergent for drugs.  See United States v. Jackson, 381
(continued...)

exceed the scope of Beltran's consent.

      B.     Probable Cause Based On Information From DEA

Law enforcement officers ordinarily must obtain a warrant, based on probable cause, before conducting a search. See New York v. Belton, 453 U.S. 454, 457 (1981). The Supreme Court has recognized an "automobile exception" which has no exigency requirement. See Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). If a car is readily mobile and officers have probable cause to believe that it contains contraband, the Fourth Amendment permits them to search the vehicle. Id.; see Maryland v. Dyson, 527 U.S. 465, 466-67 (1999). Probable cause to search a vehicle exists if, under the totality of the circumstances, a fair probability exists that the vehicle contains contraband or evidence. See United States v. Bradford, 423 F.3d 1149, 1159 (10th Cir. 2005). Probable cause is measured against an objective standard; hence, the subjective belief of an individual officer as to probable cause is not dispositive. United States v. Davis, 197 F.3d 1048, 1051 (10th Cir. 1999).

Even if Beltran had not voluntarily consented to a search of the vehicle, the search is valid because officers had probable cause to believe that the vehicle contained contraband or evidence related to drug trafficking. In addition to the above facts which established reasonable suspicion of drug activity, the following facts established probable cause:

      1.     Neither defendant showed that they were entitled to operate the vehicle.

      2.     Neither defendant knew who owned the vehicle.

---

[3](...continued)
F.3d 984, 988-89 (10th Cir. 2004) (container remained capable of performing its designated function; any loss or contamination of baby powder by search was de minimis and well short of "complete and utter destruction or incapacitation" which was focus of concern in Osage). After Trooper Lashmet discovered one package of methamphetamine, he dumped the laundry detergent on the ground but at that point, he unquestionably had probable cause to believe that the laundry box contained additional packages of methamphetamine.

3.      Beltran did not appear to know the purported name of his passenger until he looked at the driver's license which the passenger had given police.

4.      Beltran said that he was from Mexico, but he had a Missouri driver's license.

5.      Trooper Lashmet noticed air freshners throughout the vehicle.

6.      Trooper Lashmet saw several prepaid cell phones in the vehicle.

Because officers had probable cause to believe that the Honda contained contraband or other evidence of drug trafficking, they could search the entire vehicle (including the trunk) and all containers therein that might contain contraband.  See United States v. Ross, 456 U.S. 798, 825 (1982).

**IV.      Search Of Residence At 1118 North 50th Street**

Defendants argue that their consents to search the residence were involuntary because they speak and understand very little English.  Here, Special Agent Ditter testified that for both defendants, he translated into Spanish the DEA consent to search form; that he did not display a weapon or speak to defendants in a threatening manner; and that both defendants voluntarily signed the forms to search the residence.  In sum, the government has shown that the consents to search the residence were freely and intelligently given, without implied or express duress or coercion.  See Sanchez, 89 F.3d at 719.

**IT IS THEREFORE ORDERED** that Beltran-Aguilar's Motion To Suppress Evidence And Memorandum In Support (Doc. #23) filed December 12, 2008 be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED** that Torres-Garcia's Motion To Suppress Evidence (Doc. #24) filed December 12, 2008 be and hereby is **OVERRULED**.

Dated this 14th day of January, 2009, at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge